The Honorable Marilyn Edwards State Representative 2330 North Juneway Terrace Fayetteville, AR 72703-2915
Dear Representative Edwards:
I am writing in response to your request for my opinion on the following questions:
 1. What are the possible effects that Amend. 59 and 74 have on the receiving district in school annexation? As you know, the Greenland school district is in the process of consolidation and needs to urgently know how to handle different millage and indebtedness issues.
 2. During the next countywide appraisal, should the property assessment of the annexed school district cause an increase of greater than 10% in total property assessment, will the receiving school district be required to roll back millage?
 3. Using Act 1467 of 2003, can the Arkansas Department of Education rely solely on supplementary comments from a legislative audit to place an Arkansas Public School District into fiscal distress?
My inquiries reveal that the proposed merger is in fact an annexation of the Winslow School District by the Greenland School District.
RESPONSE
Your first question is difficult to address because I am unacquainted with the particular circumstances that prompted it. However, I am enclosing Ark. Op. Att'y Gen. No. 2004-044, in which I opine that Amendment 74 would mandate the continuation of differing millages within a single school district following an annexation if the voters did not approve a unitary combined millage — a condition that would complicate the process of effecting an Amendment 59 rollback.
Your second question appears to be premised on an assumption that the respective changes in the valuation of property in the receiving district and the affected annexed district will be of some independent significance in determining whether a rollback is warranted in the new district. The only significant question for purposes of determining whether Amendment 59 will apply is whether the valuation of all taxable property in the new district — i.e., the combined value of taxable property contained in the two or more former districts — has increased by more than 10%. Amendment 59 mandates what the courts refer to as a "uniform" district-wide rollback of taxes when the assessed value of property increases by more than 10% following a reappraisal.[1] With respect to the question of what is "uniform," it is unclear whether reducing each millage by an equal number of mills in a district having more than one millage would meet this requirement given that it would necessarily disproportionately affect one portion of a district. If such a reduction in a district having different millages would not qualify as "uniform," it is difficult to determine how to proceed because the law provides no formula to ensure that the rollback will be uniform. Although I can and will propose a mathematical formula that I believe would result in a "uniform" rollback in a multi-millage district, only the legislature or the Assessment Coordination Department can determine the method of calculating rollbacks in such a district.
Your third question appears to be moot since the Greenland School District has reportedly determined not to challenge its fiscal distress designation. Even if it were not moot, I would decline to address this question because this office lacks the authority to determine whether a school district is in fiscal distress. By law, there is a process of administrative appeal to challenge such a determination.
Question 1: What are the possible effects that Amendments 59 and 74 haveon the receiving district in school annexation? As you know, theGreenland School District is in the process of consolidation and needs tourgently know how to handle different millages and indebtedness issues.
It would be impossible for me to opine on all of the "possible effects that Amendments 59 and 74" might have on a school district without knowing the complete factual situation that exists in the district(s). I am neither equipped nor authorized to engage in such a fact-finding endeavor. Unfortunately, your question is not one I am prepared to address in the abstract, given that attempting to do so would entail entertaining a series of assumptions I am unable even to formulate.
With respect to the second part of your question, I have already opined in the attached Ark. Op. Att'y. Gen. No. 2004-044 regarding how a school district should handle different millage rates if the voters do not approve a unified school millage in the next school election. I further suggest that the Greenland School District contact its fiscal agent for any questions dealing with indebtedness before the next school election.
Question 2: During the next countywide appraisal should the propertyassessment of the annexed school district cause an increase of greaterthan 10% in total property assessment, will the receiving district berequired to roll back millage?
As noted above, this question is confusing in that it appears to be premised on a mistaken assumption that the "receiving district" and the "affected district" are to be treated independently for purposes of determining whether Amendment 59 dictates a rollback of taxes.[2] The school districts at issue both lie in Washington County, which my inquiries reveal assesses all property within the county, including all property contained within the two former districts, on an annual basis. For purposes of determining whether property contained within the new district has appreciated more than 10% in value, thus triggering the rollback provisions of Amendment 59,[3] the district will compare the taxable value of property throughout the new district — i.e., throughout the area that formerly comprised the two combining districts — before and after the reappraisal. Once a consolidation or annexation is complete, the resultant school district is treated as a single school district for all purposes — including Amendment 59 — albeit one with two different millage rates for at least the first six months of its existence.[4]
The qualifying phrase at the end of my last sentence bears some further discussion because it complicates the issue of how a taxing authority might calculate a rollback. As I discussed in Opinion No. 2004-044, the possibility exists under Amendment 74(c) that the voters in a district formed by annexation might reject a unitary millage, leaving the former districts with varying millages. In this regard, I should note that Amendment 59 refers to a school district in the singular as a "taxing unit," thereby suggesting that whatever effect Amendment 59 might have should be uniform throughout the district unless some later constitutional provision dictates otherwise.
At issue in your request is how to apply a rollback in a district having differing millage rates in order to meet Amendment 59's requirement that a district realize no more than 10% additional revenues in the year following a reappraisal.[5] The court touched upon this issue indirectly in Frank v. Barker, 341 Ark. 577, 20 S.W.3d 293 (2000), which held that because any rollback in a district comprising territory in two counties must be "uniform," any class action seeking a rollback must consequently include as class members the district members residing in both counties. Specifically, the court observed:
 Based on the plain meaning of the language in Amendment 59, we conclude that the Fountain Lake School District includes all taxpayers in the district, whether they reside in Saline County or Garland County. We note that in order to determine whether a rollback is required in the "taxing unit" it is necessary to include "all others interested, to protect the inhabitants thereof against the enforcement of any illegal exactions whatever." The phrase "all others interested" certainly includes all taxpayers within the school district which is the "taxing unit."
 Additionally, we note that the plain language of the amendment, when referring to the rollback, which the taxpayers in the taxing unit may be entitled to, refers to "the rate" of school district taxes levied against the taxable real and personal property in the school district being adjusted or rolled back. This language from the amendment does not grant any authority for a single taxing unit to impose various taxing rates.[6] Instead it allows for a rollback when the whole taxing unit has been subjected to a ten percent increase in taxable real and personal property in a single year. Furthermore, the rollback of "the rate" is done by the "governing body of the taxing unit;" that is, by the board of the school district. We also note that any rollback of the rate of taxation must be uniform. The Arkansas Constitution in article 16, § 5 provides in part:
 all real and tangible personal property subject to taxation shall be taxed according to its value, that value to be ascertained in such manner as the General Assembly shall direct, making the same equal and uniform throughout the State. No one species of property for which a tax may be collected shall be taxed higher than another species of property of equal value. . . .
 Id. Pursuant to this constitutional language, it is clear that one uniform rate of taxation must be applied to property of equal value throughout the school district, which is the taxing unit. Additionally, we note that all members of the class share a common interest in the fair and uniform distribution of any rollback by a uniform reduction in the rate of taxation throughout the taxing unit. The dissent urges that the constitutional requirement of a uniform rate of taxation within a taxing unit has been overturned by the legislative enactment of Act 848 of 1981 partially codified at Ark. Code Ann. § 26-26-408 (Repl. 1997). However, we find no authority to support the proposition that a statutory provision overrides a constitutional principle.[7]
In my opinion, the paramount principle to be drawn from this passage is that any rollback of taxes within a district must apply uniformly to all areas of the district. Determining what this means in a district that has divergent millages following a consolidation or annexation may be difficult. Nothing in the constitution, the Code or the case law directly addresses this issue. However, Barker clearly suggests, first, that the determination of whether a rollback is warranted must be based on a consideration of circumstances throughout the district and, secondly, that the rollback must apply uniformly throughout the district. If, based upon that determination, a district with different rates is obliged to roll back taxes, the only remaining question will be how to effect the rollback "uniformly."
The law provides no clear guidance regarding this question. A uniform rollback in a district having varying millage rates might entail simply deducting an equal number of mills from the areas of the district having different rates. On the other hand, because doing so would disproportionately benefit the section of the district having the lower millage, it is possible that an across-the-board reduction in millage throughout the district would not qualify as "uniform." In the latter event, the Assessment Coordination Department, in consultation with this office, see A.C.A § 26-24-106 (Repl. 1997), would need to develop whatever formulas will apply to result in a proportionally equal rollback in the respective areas of the district having varying millages.[8]
I also note, first, that a rollback could never result in a tax rate below the 25-mill uniform rate of tax Amendment 74 mandates for maintenance and operation of the schools and, secondly, that Amendment 59 expressly prohibits any rollback that would undermine the requirements of the bond indenture. Finally, I note that your question poses a hypothetical situation which may or may not occur and which has not been addressed by any judicial, legislative or regulatory body. Amendment 59 makes no mention of what happens in the case of school district restructuring. This is an area in which either legislative clarification or regulatory clarification by the Assessment Coordination Department is sorely needed. See Ark. Op. Att'y Gen. No. 2000-223 (concluding that "the Assessment Coordination Department has full authority to choose a specific method of calculating the rollback provision of Amendment 59 that would serve both the spirit and the letter of Amendment 59").
Question 3: Using Act 1467 of 2003, can the Arkansas Department ofEducation rely solely on supplementary comments from a legislative auditto place an Arkansas public school district into financial distress? (Theschool district received no audit exceptions and was not required toappear before the Legislative Audit Committee.)
This question may be moot. According to recent news accounts, the board of the Greenland School District has voted not to appeal its fiscal distress designation.[9] However, I do not know whether the board has reversed its position on this score. My inquiries reveal that the superintendent of the Greenland School District received a certified letter, return receipt requested, as provided under A.C.A § 6-20-1905(a) and Section 6.01 of the Rules Identifying and Governing the ArkansasFiscal Assessment and Accountability Program (ADE 158), on or about April 8, 2004. In accordance with A.C.A § 6-20-1905(b) and Section 6.02 of the same Rule, the school district had 30 days to appeal the letter from the Department of Education to the State Board of Education. I am unaware whether the district has done so. If the district has appealed, then the State Board will have 60 days to act upon the appeal. If the State Board upholds the determination of the Department, the school district may appeal that decision to the Pulaski County Circuit Court. See generally
A.C.A § 6-20-1905 and Section 6 of the Rules Identifying and Governingthe Arkansas Fiscal Assessment and Accountability Program (ADE 158). The question that you pose could consequently be a part of an administrative adjudication if the Greenland School District has appealed the notification identifying the district as being in fiscal distress. This office lacks the authority to make any such determination, and I will not opine on the propriety of a particular determination that the legislature has declared subject to challenge in the manner described above.
Assistant Attorney General Jack Druff prepared the foregoing opinion, which I hereby approve.
Sincerely,
MIKE BEEBE Attorney General
MB:JD/cyh
[1] Frank v. Barker, 341 Ark. 577, 582-83, 20 S.W.3d 293 (2000). This concept of a "uniform" rollback of taxes should not be confused with the concept of a "uniform rate of tax" mandated for maintenance and operation of the schools pursuant to Amendment 74.
[2] The quoted terms are somewhat confusing as defined at A.C.A § 6-13-1401 (Supp. 2003), which provides in pertinent part:
 (1) "Affected district" means a school district that loses territory or students as a result of annexation or consolidation;
* * *
 (4) "Receiving district" means a school district or districts that receive territory or students, or both, from an affected district as a result of annexation[.]
These definitions are misleading within the context of title 6, chapter 13, subchapter 14 of the Code because that subchapter envisions not merely an indeterminate loss of students or territory by an affected district as a result of annexation, which the definition appears to envision, but rather the complete merger of the affected district into the receiving district.
[3] Amendment 59 defines as the event triggering a rollback "an increase in the aggregate value of taxable real and personal property in any taxing unit in this State of ten percent (10%) or more over the previous year. . . ." However, as discussed infra, the Amendment 59 calculation is based not upon the appraised value of property, as the quoted passage might suggest, but upon assessed value resulting in revenues. Although it does not bear directly on your question, I will note that, as a practical matter, it appears that the circumstances that would require a rollback based upon assessed values and the projected percentage increase in revenues would arise very seldom. Amendment 79 provides that increases in the assessed value of property, excluding newly discovered real property, new construction or substantial improvements to real property, will be limited to 10% in any given year, and to 5% on a homestead. The amendment further precludes increasing the assessed value of the homesteads of the disabled or persons over the age of 65. It would appear, then, that the conditions that would trigger an Amendment 59 rollback — namely, a projected increase of revenues exceeding 10% following a reappraisal absent a rollback — would occur only if there were a remarkable increase in newly discovered real property, new construction or substantial improvements to real property within a taxing unit in a given year.
[4] As I noted in Opinion No. 2004-044, pursuant to Amendment 74(c), which was adopted after Amendment 59 and hence will control in the event of a conflict, a consolidated district or a receiving district following annexation will necessarily have divergent millage rates from the effective date of the annexation on July 1, see A.C.A § 6-14-1405(a)(1) (Supp. 2003), until the commencement of the new tax year on the following January 1, and it may continue to have divergent rates following this date if the new district voters fail to approve a uniform rate. Amendment 74(c); see discussion in Opinion 2004-044. See also Atkinson v. El DoradoSchool District No. 15, 267 Ark. 212, 590 S.W.2d 5 (1979) (holding that varying millage rates in a merged district will remain as they were prior to the annexation until the voters determine otherwise at the annual election); accord Ark. Op Att'y Gen. No. 88-319; see also Ark. Ops. Att'y Gen. Nos. 89-027 and 85-107 (opining that the millage rates of merged districts will remain as they were before merger if the voters fail to approve a new millage).
[5] The fundamental object of Amendment 59 appears to be to increase taxes as little as possible, if at all, on previously taxed property. The amendment achieves this end as follows. The first step in any rollback is to calculate a reduced millage that would result in no tax increase on previously taxed real property. (This calculation excludes the assessed value of personal property, newly discovered and newly constructed property and all real and tangible personal property of public utilities and regulated carriers.) The next step is to multiply the reduced millage by the assessed value of newly discovered and newly constructed property. If the product equals or exceeds 10% of base-year revenue (i.e., tax proceeds in the year before the post-reappraisal assessments apply), the reduced millage will apply to all property in the district. The effect will be to spare previous taxpayers any increase in taxes and to realize all of the 10%-plus increase in revenues from newly discovered and newly constructed property, which will obviously also be taxed at a lower rate than if there had been no rollback. Alternatively, if multiplying the zero-growth millage by assessments on newly discovered and newly constructed property yields less than 10% of base-year revenues, the district board may adjust the zero-growth millage anywhere up to a point that will realize revenues exactly 10% above those realized in the base year. In this case, previous taxpayers will collectively pay more than they did in the base year, although the increase will never exceed 10% and the adjusted millage rate will never exceed the base-year millage rate approved by the voters. Only under this latter formula, then, is there an absolute guarantee that tax revenues will not increase more than 10% in the year following a reappraisal.
[6] I consider this sentence dictum in light of the fact that the only issue before the court was whether a rollback in the district must be "uniform," thus mandating that all district residents in both counties be joined as class members. The court was not faced with the question of whether the millage rate(s) imposed in the district must likewise be "uniform." With respect to the latter issue, as I noted in Opinion No.2004-044, pursuant to Amendment 74(c), which was adopted after Amendment 59 and hence will control in the event of a conflict, a consolidated district or a receiving district following annexation may continue to have divergent rates following this date if the new district voters fail to approve a single district-wide rate. Amendment 74(c); see discussion in Opinion 2004-044; see also A.C.A § 26-80-111(b), as amended by Act 105 of 2003 (2d Ex. Sess.) (providing that millage rates in districts subject to annexation or consolidation will remain the same unless the voters approve a unitary rate). Having not been confronted with the issue, the court in Barker appears simply to have overlooked the possibility of divergent millages resulting from annexation or consolidation.
[7] Section 26-26-408 of the Code (Repl. 1997) provides that in "fringe" districts comprising portions of more than one county, a reappraisal of property in one county will trigger a rollback of taxes in the portion of the district contained within the reappraised county but not in the portion of the district contained in the other. The statute further provides that when the other county reappraises its property and rolls back its millage "the rolled back millage for the first part of the school district that has been reappraised and the rolled back millage for each succeeding part of the school district that has been reappraised shall be averaged, weighted by the percentage of the total assessment of the school district that each part consists of in order to create a weighted average millage, and thereafter the weighted average millage for the school district will be the millage rate levied in the whole school district." Under this formulation, for a period of time a fringe district may have differing millages, which will eventually be unified as a "weighted average millage." The court in Barker speculated, although it did not declare outright, that this statute is unconstitutional in that it approved a rollback in only a portion of a school district in derogation of Amendment 59. 341 Ark. at 583.
[8] This office will consult with the Assessment Coordination Department in order to determine the appropriate approach to this issue. For purposes of this opinion, I will simply offer the following algebraic equations as offering one means of determining proportionally rolled-back millages in a district having more than one millage rate. I should stress that the revenue variables referenced below should apply only to amounts realized within the geographical area of a particular district that is subject to a particular millage.
Definitions:
• Subscript "s" = Each Area Subject to a Particular Millage Rate From 1 to
 N
• = Sum of
• X = Base Year Millage (i.e., the millage in the year before
 the reappraisal takes effect)
• X1 = Zero-Growth Millage (i.e., the millage that if applied
 post-reappraisal would yield the same revenue as realized from real
 property taxed in the base year, excluding from the calculation newly
 discovered property, new construction and property owned by public
 utilities and regulated carriers)
• X2 = Readjusted Millage or Final Millage
• BYR = Revenues Collected on Taxable Real Property in the
 Base Year
• PRA = Post-Reappraisal Assessments Minus Tangible Personal
 Property, Newly Discovered Real Property, New Construction and Property
 Owned by Public Utilities and Regulated Carriers
• APRA = All Post-Reappraisal Assessments Minus Tangible Personal
 Property and Property Owned by Public Utilities or Regulated Carriers
• ND = Assessments on Newly Discovered Property, New
 Construction and Improvements
• NDR = Tax Revenue Realized from ND
Solve for X2
IF Xs (APRAs) 1.10(BYRs) THEN X2s = Xs ELSE
X1s = BYRs
 PRAs
NDRs = X1s (NDs)
IF NDRs .10 (BYRs) THEN X2s = X1s ELSE
X2s = 1.10 (BYRs)
 APRAs

In accordance with my statutory obligations, this office will provide a detailed explanation of these equations to officials of the Assessment Coordination Department. For purposes of the present discussion, I will merely note that under the express terms of Amendment 59, the figures used in these computations must reflect only variations in "local tax revenues." (Emphasis added.) Amendment 59 is explicit in declaring that the rollback shall apply only to "the rate of city or town, county, school district, and community college district taxes levied. . . ." In my opinion, this directive precludes including within tax revenues for purposes of this computation all revenues realized from the 25-mill uniform rate of tax mandated by Amendment 74. As I noted in Ark. Ops. Att'y Gen. Nos. 2003-031 and 2003-065, the uniform rate of tax is astate tax levied by the voters themselves in adopting Amendment 74. As a logical matter, this portion of ad valorem property tax revenues does not fall within the parameters of Amendment 59. See A.C.A § 26-80-405, as enacted by Act 105 of 2003, § 2 (2nd Ex. Sess.) (mandating a formula that will ensure that the uniform rate of tax will never be subject to rollback). The same conclusion would appear to apply to revenues realized from the state's reimbursement to the school districts of revenues the districts have lost by operation of Amendment 79(3), which mandates at least a $300 annual homestead credit against property taxes unless the total taxes due are less than this amount. The legislature's discretionary decision to authorize these state payments, which are in no sense mandated by Amendment 79, precludes characterizing these revenues as arising from local district taxes, which is the only category of revenues to which Amendment 59 applies.
[9] Rose Ann Pearce, "Winslow, Greenland to Seek Legal Advice on Merger," Arkansas News Bureau (April 28, 2004), retrieved from http://www.arkansasnews.com/archive/2004/04/28/News/190477.html on April 30, 2004.